A96A1166. IN THE INTEREST OF C. D. F. et al., children.
(476 SE2d 654)

RUFFIN, Judge.

Sonya Foster appeals from an order of the juvenile court terminating her parental rights to her son, C. D. F., born January 24, 1990, and her daughter, K. D. F., born December 29, 1988. For reasons which follow, we affirm.

1. In two enumerations of error, Foster asserts that the State did not prove by clear and convincing evidence that her parental rights should have been terminated under OCGA § 15-11-81 (b).

On appeal, we must view the evidence in a light most favorable to the judgment of the juvenile court and determine whether any rational trier of fact could have found by clear and convincing evidence that Foster's rights to custody were lost. *In the Interest of D. T.,* 221 Ga. App. 328, 329 (1) (471 SE2d 281) (1996).

Viewed in this light, the evidence showed that Foster has a long history of hospitalization for mental illness. In 1985, when Foster was 23 years old, she entered the hospital for one month complaining that she was hearing voices and that "people [were] after her and out to get her." After experiencing similar problems in June 1987, Foster was again hospitalized for approximately three weeks. Only three days after being discharged, Foster re-entered the hospital for approximately two weeks suffering from paranoid delusions. Foster's mental illness continued, and she entered the hospital a total of 13 times between 1985 and September 1993.

In August 1992, Foster placed physical custody of C. D. F. with her cousin. The cousin returned C. D. F. to Foster in March 1993. Later that month, while K. D. F. was living with Foster's parents, Foster, who was now homeless, lived with C. D. F. in a hospital emergency room for two days. A police officer took custody of C. D. F., and on April 12, 1993, the juvenile court entered an order finding C. D. F. deprived.

The juvenile court provided Foster with several reunification plans between April 1993 and September 1994. Under the first reunification plan, the court required Foster to submit to a psychological evaluation. The evaluating psychologist testified that Foster "was not in touch with reality and that she was delusional and . . . psychotic at the time of the interview[ ]" in August 1993. Foster told the psychologist that drug pushers were following her and out to kill her. Foster also told the psychologist that she would not leave her home without a disguise and that she carried a shotgun on the street when she had her son with her. The psychologist concluded that Foster's "ability to take care of her child . . . was grossly impaired and would likely cause trauma to the child, as well as possible physical harm. . . ."

Despite submitting to the psychological evaluation, Foster failed to comply with several other requirements contained in the reunification plans. While receiving welfare and social security benefits, Foster never paid the $5 in monthly support for C. D. F. as required by the plans. Foster also failed to complete the parenting classes required by the plans. Although the plans required Foster to remain drug and alcohol free and participate in a substance abuse program, Foster contended she did not have a drinking problem and did not attend the program. Foster did not find stable, adequate, and safe housing as required by the plans. The evidence showed that Foster was evicted from public housing for failing to pay rent and that she lived with several different relatives. Foster did not notify her Department of Family & Children Services ("DFCS") caseworker of her changes in address, which was also required by the plans. Foster did not obtain stable employment as the plans required. Finally, Foster failed to comply with the requirement that she continue mental health treatment and take her prescribed medications.

Because Foster failed to continue treatment and take her medications, she often became delusional and had to be readmitted into the hospital. Foster entered the hospital for approximately three weeks in February 1995 after a police officer found her wandering the streets, walking in traffic, and stating that someone was going to kill her. Foster asked the officer to shoot her. When Foster was admitted to the hospital, she asked the admitting physician whether she should shoot another patient in the waiting room. Foster re-entered

the hospital for a one-month period on March 13, 1995, after a violent episode at her sister's house during which Foster pulled a knife on her sister. Both episodes were attributed to Foster's failure to obtain treatment and take prescribed medication, which Foster admitted she takes only "when she feels like it." Although Foster was admitted to a group home for the mentally ill after being discharged from the hospital, she remained there for only 24 hours.

On April 4, 1995, the juvenile court determined that K. D. F. was also deprived. The court's deprivation order contained a reunification plan that, among other things, required Foster to pay $10 per month in child support for K. D. F.

The evidence at K. D. F.'s deprivation hearing showed that for the 18 months preceding the hearing, Foster had difficulty caring for K. D. F. In February 1994, Foster's parents, who had custody of K. D. F. for the preceding year, returned her to Foster. In August 1994, Foster visited her DFCS caseworker and informed her that she wanted to place K. D. F. for adoption because "the drug lords were after her and . . . she needed to leave." Foster subsequently abandoned K. D. F. in the DFCS lobby. DFCS placed K. D. F. and C. D. F. with Foster's sister. Foster's sister returned the children to DFCS in March 1995 after Foster appeared at her apartment, intoxicated, and became violent. The sister testified that Foster became "real violent . . . broke up the glasses . . . and she broke out the big old wall unit." This was the same violent episode that precipitated Foster's hospitalization on March 13, 1995. Foster admitted at K. D. F.'s deprivation hearing that she was not in a position to care for the child.

The foregoing constituted clear and convincing evidence that Foster's parental rights to K. D. F. and C. D. F. were properly terminated due to her inability to care for the children. See OCGA § 15-11-81 (b) (4) (A). The unappealed orders of the juvenile court dated April 12, 1993, and April 4, 1995, established that the children were deprived. *In the Interest of A. M. B.*, 219 Ga. App. 133, 134 (464 SE2d 253) (1995). Furthermore, although Foster may love her children and there is no evidence that she was ever violent towards them, the clear and convincing evidence shows that her mental disability has rendered, and continues to render, her incapable of furnishing the " 'proper parental care and control necessary for the [children's] physical, mental and emotional health and that these conditions and causes of deprivation are likely to continue for the foreseeable future.' " *In re S. R. J.*, 176 Ga. App. 685, 686 (337 SE2d 444) (1985). Finally, it is clear that Foster's conduct is likely to cause the children serious physical, mental, or emotional harm. The children are at risk if they are present while Foster is roaming through traffic or wandering the streets armed and experiencing delusions, if she turns violent to those around her, or if she abandons them in a public place

because she feels she can no longer care for them. "The trial court's order contained detailed findings which supported the conclusions necessary to justify the termination of [Foster's] parental rights. Those findings were supported by clear and convincing evidence." (Citations and punctuation omitted.) *In the Interest of J. H.*, 210 Ga. App. 255, 258 (1) (435 SE2d 753) (1993).

2. Foster further contends the trial court erred in terminating her parental rights because her failure to pay the child support ordered in the reunification plans was not wilful or wanton and, in the case of K. D. F., in excess of one year. See OCGA § 15-11-81 (b) (2). However, the juvenile court did not terminate Foster's parental rights under OCGA § 15-11-81 (b) (2), and Foster's failure to pay child support was but one of many factors the court considered in determining whether Foster was able to care for the children. See *In the Interest of A. M. B.*, supra at 135-136. Accordingly, we find no error.

3. Similarly, the trial court did not err in terminating Foster's parental rights absent a showing that she failed to comply with K. D. F.'s reunification order for a period of one year or longer prior to the filing of the petition for termination of parental rights. See OCGA § 15-11-81 (b) (4) (C). The juvenile court was not limited to terminating Foster's parental rights under OCGA § 15-11-81 (b) (4) (C), and a showing supporting the factors listed in that subparagraph was not mandatory. *In the Interest of A. M. B.*, supra at 136. Accordingly, we find no error.

4. Finally, Foster asserts that the trial court erred in denying her motion for continuance. We disagree.

The record shows that on May 4, 1995, the trial judge granted Foster's motion seeking funds for a psychological evaluation. The court originally scheduled the termination hearing for June 15, 1995, but continued it from that date to allow Foster to obtain the evaluation. In its order continuing the case, the court rescheduled the termination hearing for July 7, 1995, and specifically required that all mental examinations be concluded by that date.

At the July 7, 1995 termination hearing, Foster moved the court for another continuance contending that she was unable to obtain the psychological evaluation. When the trial judge asked Foster why she did not attend a scheduled appointment for the evaluation, Foster replied: "I had to go to the Sheriff Department the same day. I was taking exam [sic]. As I left there, I tried to find the place and I could not find it." Foster further explained that although she had the address, she did not ask anyone where it was because she wanted to find it on her own. The court denied the motion for another continuance, finding that it was in the best interests of the children to resolve the matter. The trial judge further stated that if, during the

hearing, he felt he could not reach a just decision without the evaluation, he would grant a continuance for an evaluation.

Under these circumstances, the trial court did not abuse its discretion in failing to grant Foster's motion for a continuance. See OCGA §§ 9-10-166; 9-10-167. See also *In re C. M.*, 179 Ga. App. 508, 510 (2) (347 SE2d 328) (1986).

*Judgment affirmed. McMurray, P. J., and Johnson, J., concur.*

DECIDED SEPTEMBER 26, 1996.

*Caesar J. Burch*, for appellant.

*Michael J. Bowers, Attorney General, William C. Joy, Stephanie M. Baldauff, Senior Assistant Attorneys General, Shalen A. Sgrosso, Assistant Attorney General, Leo G. Beckmann, Jr.*, for appellee.